# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ONEEB REHMAN, individually, | ) | |
| and on behalf of others similarly situated, | ) | **Case No:** |
| | ) | |
| Plaintiff, | ) | <u>**CLASS ACTION**</u> |
| | ) | |
| v. | ) | <u>**JURY TRIAL DEMANDED**</u> |
| | ) | |
| DANIA ENTERTAINMENT CENTER, | ) | |
| LLC, a Delaware limited liability company, | ) | |
| d/b/a "The Casino at Dania Beach", | ) | |
| | ) | |
| Defendant. | ) | |

## <u>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE</u>
## <u>FAIR AND ACCURATE CREDIT TRANSACTIONS ACT (FACTA)[1]</u>

Plaintiff Oneeb Rehman ("Plaintiff"), on behalf of himself and other similarly situated individuals, sues Defendant Dania Entertainment Center, LLC, d/b/a The Casino at Dania Beach ("Casino" or "Defendant"), and alleges the following upon information and belief, and his own personal knowledge.

## NATURE OF THE CASE

1.    This action arises from Defendant's violation of the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et*

---

[1] Plaintiff would inform the Court that an identical case is currently on file in the Circuit Court of Broward County, Florida, Case No. CACE-18-003760. However, in light of the Eleventh Circuit's recent holding in *Muransky v. Godiva Chocolatier, Inc*., 16-16486, --F.3d--2018 WL 4762434, at *6, 7 (11th Cir. Oct. 3, 2018), Plaintiff wishes to exercise his right to litigate this matter in Federal Court. "The rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction, for both the state and Federal courts have certain concurrent jurisdiction over such controversies, and when they arise between citizens of different states the Federal jurisdiction may be invoked, and the cause carried to judgment, notwithstanding a state court may also have taken jurisdiction of the same case." *McClellan v. Carland*, 217 U.S. 268, 281, 30 S.Ct. 501, 54 L.Ed. 762 (1909).

*seq.*, as amended (the "FCRA"), which requires Defendant to truncate certain credit card and debit card information on printed receipts provided to consumers. Despite the clear language of the statute, Defendant knowingly or recklessly failed to comply with FCRA by printing eight (8) of the credit card or debit card numbers on printed receipts provided to consumers. As a result of Defendant's unlawful conduct, Plaintiff and the Class who have conducted business with Defendant during the time frame relevant to this complaint have suffered a violation of their substantive rights under § 1681c(g), an invasion of their privacy, breach of their confidence in the safe handling of their account information, exposed to an elevated risk of identity theft, and burdened with the need to keep or destroy the receipt in order to prevent further disclosure of their account information. Recently, the Eleventh Circuit Court of Appeals held that a receipt that failed to truncate the first six and last four digits of a credit or debit card number is a concrete harm. *See Muransky v. Godiva Chocolatier, Inc*., 16-16486, --F.3d--2018 WL 4762434, at *6, 7 (11th Cir. Oct. 3, 2018). Consequently, Plaintiff and the Class are entitled to an award of statutory damages and other relief as further detailed herein.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction under 15 U.S.C. § 1681p, and 28 U.S.C. §§ 1331 and 1337 because the claims in this action arise under violation of a federal statute.

3.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred here. Defendant does business in this District and their contacts here are sufficient to subject them to personal jurisdiction.

## PARTIES

4.      Plaintiff Oneeb Rehman is a natural person who resides, and at all times relevant herein has resided, in Palm Beach County, Florida.

5.      Defendant, Dania Entertainment Center, LLC, is a Delaware limited liability company corporation whose principal address is 301 E. Dania Beach Boulevard, Dania Beach, Florida 33004, and whose registered agent for service of process is in the state of Florida is Mario Rodriguez, 301 E. Dania Beach Blvd., Dania Beach, FL 33004

## FACTUAL ALLEGATIONS

### A.      *Background of FACTA*

6.      Identity theft is a serious issue affecting both consumers and businesses. As of 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[2] There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.[3]

7.      Congress enacted FACTA to prevent actual harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

8.      Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

---

[2] Source: https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html (Last Accessed: Oct. 16, 2018).
[3] Source: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime. (Last Accessed: Oct. 16, 2018).

9.      One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a point of sale transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

10.      Codified at 15 U.S.C. § 1681c(g), this provision states the following:

> *Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.*

15 U.S.C. § 1681c(g) (the "Receipt Provision").

11.      After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

12.      The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether . . . The first phase of this new policy goes into effect July 1, 2003 for all new terminals . . . ."[4] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

---

[4]      *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003), https://www.finextra.com/newsarticle/8206/visa-to-hide-card-numbers-in-bid-to-cut-identity-theft (Last Accessed: Oct. 16, 2018).

13.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[5]

14.     Because a handful of large retailers did not comply with their contractual obligations with the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make technical corrections to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[6]

15.     Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date of the card number. Instead, it simply provided amnesty for certain past violators up to June 3, 2008.

16.     In the interim, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN

---

[5]     *Rules for Visa Merchants*, VISA (Sept. 1, 2007), http://www.runtogold.com/images/rules_for_visa_merchants.pdf. (Last Accessed: Oct. 16, 2018).
[6]     *H.R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007*, GOVTRACK, https://www.govtrack.us/congress/bills/110/hr4008/text (Last Accessed: Oct. 16, 2018).

and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

*See* Visa Alert attached hereto as **Exhibit A**.

17.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

> Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

*See* **Exhibit B**, attached hereto.

18.     Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

> A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

See **Exhibit C**, attached hereto.

19.     According to data from the Federal Trade Commission's 2017 Consumer Sentinel Network Data Book, Florida with its 208,443 complaints ranks No. 1 for the highest per capita rate of reported fraud and other types of complaints.[7]  For identity theft, Florida is ranked No. 2 in

---

[7] Source: https://www.ftc.gov/policy/reports/policy-reports/commission-staff-reports/consumer-sentinel-network-data-book-2017/main (Last Accessed: Oct. 16, 2018).

the country with a total of 31,167 complaints, with total loses from fraud estimated at $54.7M.[8]
Also, some of the top metro areas for identity theft are in Florida, according to the report.  First is
the Cape-Coral-Ft. Myers area with 781.0 complaints per 100,000 people, and the Miami-Dade
area counts 743.0 complaints per 100,000 people.[9]

20.     So problematic is the crime of identity theft that the three main credit reporting
agencies, Experian, Equifax, and Transunion, joined to set-up a free website
(http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide
the citizens of this country with a means of monitoring their credit reports for possible identity
theft.

21.     FACTA clearly prohibits the printing of more than the last five (5) digits of the card
number to protect persons from identity theft.

**B.      CASINOS SUCH AS DEFENDANT'S ESTABLISHMENT ARE BREEDING
GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS**

22.     Consumer identity theft, against which the Receipt Provision was designed to
protect, is especially rampant at gambling establishments like the one operated by Defendant.

23.     It has been estimated that "40 percent of white-collar crime has its root in
gambling."[10]

24.     "[T]he ready availability of credit in and around casinos," including in Defendant's
establishment, "can lead to irresponsible gambling and problem and pathological gambling

---

[8] Source: https://www.ftc.gov/policy/reports/policy-reports/commission-staff-reports/consumer-sentinel-network-data-book-2017/state-rankings-id-theft-reports (Last Accessed: Oct. 16, 2018).
[9] *Id.*
[10]     The Congressional Record, Feb. 10, 1997, at H401,
https://www.gpo.gov/fdsys/granule/CREC-1997-02-10/CREC-1997-02-10-pt1-PgH401/content-detail.html (citing The Economist, Jan. 25, 1997) (Last Accessed: Oct. 16, 2018).

behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises.  Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customer on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[11]

25.     "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[12]   In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[13]

26.     "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with <u>white-collar crimes, such as embezzlement, forgery and fraud</u>."[14]  (emphasis added).  For instance, "[i]n a survey of nearly 400 Gamblers  Anonymous  members,  57 percent  admitted  stealing  to  finance  their  gambling.

---

[11]     *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, http://govinfo.library.unt.edu/ngisc/reports/7.pdf (Aug. 3, 1999), at 7-14. (Last Accessed: Oct. 16, 2018).
[12]     *Id.* at 7-13.
[13]     *Casino Gambling: Is it A Good Bet for Florida's Future?* Jerry J. Yates, at 11, https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx. (Last Accessed: Oct. 16, 2018).
[14]     *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects*, Spectrum Gaming Group (Oct. 28, 2013), http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf. (Last Accessed: Oct. 16, 2018).

Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft</u>."[15] (emphasis added).

27.     Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades.  For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[16]

28.     More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake credit cards at casinos, manufactured using stolen personal information.[17]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun

---

[15]     *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

[16]     *Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://www.courant.com/news/connecticut/hc-xpm-1992-05-16-0000201897-story.html (Last Accessed: Oct. 16, 2018).

[17]     *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (Last Accessed: Oct. 16, 2018); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), https://www.independent.com/news/2011/feb/18/deputies-nab-five-credit-card-fraud/ / (Last Accessed: Oct. 16, 2018).

and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[18]  In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[19] and ten people were arrested in New Orleans, Louisiana "on racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[20]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[21]

29.    The Federal Trade Commission's Red Flags Rule requires businesses and organizations such as Defendant to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

30.    Defendant is subject to an array of strict federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules uniformly require "creditors," a term encompassing Defendant

---

[18]    *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), https://www.nbcconnecticut.com/news/local/Police-Break-Up-Casio-Credit-Card-Scam-142965455.html (Last Accessed: Oct. 16, 2018).
[19]    Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (Last Accessed: Oct. 16, 2018); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (Last Accessed: Oct. 16, 2018).
[20]    *10 charged in cash-advance fraud scheme at Harrah's Casino*, (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (Last Accessed: Oct. 16, 2018).
[21]    *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), https://www.nbcconnecticut.com/news/local/Police-Make-Credit-Card-Fraud-Arrests-at-Foxwoods-Hotel--365746371.html (Last Accessed: Oct. 16, 2018).

and its various establishments, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

31.     In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Defendant should certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions.  This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

32.     As part of its ongoing duty to consistently update its identity-theft prevention program, Defendant would reasonably be expected to periodically hire third-party service providers to audit and propose improvements to its compliance program and to train Defendant's cage and other personnel in best practices for identity-theft prevention.  These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos' failure to comply.  Through these and other training programs, Defendant would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

C.    DEFENDANT'S PRIOR KNOWLEDGE OF FACTA

33.    Defendant had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.  Indeed, Karen Lopez, currently an Acting Director at Defendant's casino, claims to have conducted "internal investigations and department trainings" specifically for the purpose of "protect[ing] the assets and every individual on property" and "provide maximum deterrence, detection and immediate response to: theft, cheat/scams on property, harm to our employees and guests . . .," such as identity theft.[22]  So too, Stephan Yohay, a current Surveillance Assistant Manager at Defendant's casino.[23]  To that end, Lopez has also received training on casino "data archiving" and casino "risk and needs assessment" through the University of Reno, Extended Studies, Gaming Management Program, which training, upon information and belief, would cover, among other things, the need for strict compliance with FACTA's receipt truncation provisions.[24]

34.    Defendant's CEO, Scott Savin, is also chief operating officer of Southwest Florida Enterprises d/b/a Magic City Casino, which operates Magic City Casino in Miami, Florida.  Under Savin's management and direction, Magic City Casino (in stark contrast with Defendant) has adopted and implemented policies and procedure to strictly comply with FACTA's truncation requirement.  Savin and Defendant's other employees' knowledge of the requirements of FACTA is imputed to Defendant.

---

[22] See https://www.linkedin.com/in/karen-lopez-27736a119/ (Last viewed: October 16, 2018).
[23] See https://www.linkedin.com/in/stephen-yohay-26785614a/ (Last viewed: October 16, 2018).
[24] See http://extendedstudies.unr.edu/gaming.html; see also https://exreg.unr.edu/ecs/CourseListing.aspx?master_id=952&master_version=2&course_area=GM&course_number=511&course_subtitle=00 (specifically addressing Title 31 and other casino financial transaction compliance and training)

35.     Moreover, there are numerous Florida statutes and operating regulations governing gambling, pari-mutuel wagering, slot machines and card rooms -- all of which Savin and Defendant's other employees are well-versed in -- that require Defendant to maintain its establishment in full compliance with state and federal regulations such as FACTA.

36.     Defendant's self-professed knowledge and experience regarding federal laws governing financial transactions no doubt translates to Defendant having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.  Yet, Defendant has a record of derelict data systems and regulatory noncompliance.  While CEO Scott Savin tellingly admits that Defendant and its owners' "only goal" is "to make money," Dania Casino is one of the worst performing casinos in the region.  Cost- and corner-cutting may help explain Defendant's record of reckless noncompliance and derelict processes and procedures.  For examples, just six months after opening, Defendant was forced to close for a year, while "its owners were ***forced to write a check to the state for nearly $400,000 after it under-reported its taxes*** for three months because of an alleged ***software glitch***."[25]

37.     Most of Defendant's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendant could have readily done the same.

38.     Not only was Defendant so informed not to print more than the last five digits of credit cards or debit cards, it was contractually prohibited from doing so. Defendant accepts credit cards and debit cards from all major issuers, such as Visa, MasterCard, American Express and

---

[25] Source: https://www.miamiherald.com/news/local/community/miami-dade/article1980454.html (Last Accessed: Oct. 16, 2018).

Discover Card. Each of these companies sets forth requirements that merchants, including Defendant, must follow, including FACTA's redaction and truncation requirements found in the Receipt Provision.

39.     As discussed above, the casino gaming industry is one of the main targets for identity theft. As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Defendant's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its establishment, at minimum Defendant was acting with reckless disregard of the FACTA requirements and purpose when printing eight (8) digits of credit cards and debit cards, together with other pieces of sensitive information of its customers, including their initialed signatures.

40.     Upon information and belief, the violations at issue arose when Defendant installed new credit and debit card payment systems in its establishment.

41.     Upon information and belief, prior to the rollout of its new system, Defendant had a written policy in place requiring the truncation of credit card account numbers; this is evidenced by the fact that prior to the installation of the aforementioned system, Defendant was actually truncating credit card and debit card account numbers in accordance with FACTA.

42.     Upon information and belief, a manual was provided to Defendant's employees for the operation of the new system which explained that the company is able to determine which fields will appear on a printed receipt and further explained that the company is able to truncate credit card and debit card numbers.

43.     Moreover, Plaintiff is informed and believes, and thereupon alleges, that Defendant has had, for over the past year, actual knowledge of other FACTA litigation initiated and

threatened to be initiated in courts throughout the country against other gaming establishments that use the same exact debit and credit card processing technology as Defendant uses to process transactions and print receipts. Remarkably, Defendant's printing of transaction receipts in total violation of FACTA's truncation requirement has continued unabated, in total disregard of the law and its patrons' financial privacy and security.

### D.   PLAINTIFF'S FACTUAL ALLEGATIONS

44.     On or about December 5, 2017, Plaintiff used his personal credit card to perform a transaction at Defendant's Casino at Dania Beach.

45.     Plaintiff paid using his personal credit card and subsequently was presented with an electronically printed receipt bearing the first four (4) and last four (4) digits of his credit card account number.

46.     In addition to bearing eight (8) digits of his credit card, the receipt identifies the complete first and last name and initialed signature of Plaintiff, the individual to whom the card is issued, as well as the card issuer (in this case VISA) and the transaction date and time.

47.     By printing of the first four (4) and last four (4) digits of his Visa credit card account number Defendant breached Plaintiff's confidence. Additionally, Defendant's mishandling of his information also breached an implied bailment.

### E.   DEFENDANT'S MISDEEDS

45.     At all times relevant herein, Defendant was acting by and through its subsidiaries, agents, servants and/or employees, including without limitation the Casino at Dania Beach and the employees thereof, as well as the electronic payment processing company retained by Defendant, each of which were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendant.

46.     At all times relevant herein, the conduct of Defendant, as well as that of its subsidiaries, agents, servants and/or employees, including without limitation the Casino at Dania Beach and the employees thereof, as well as the electronic payment processing company retained by Defendant, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

47.     Plaintiff is informed and believes, and thereupon alleges, that Defendant implements, oversees, and maintains control over the same uniform debit and credit card payment processing policies, practices, and procedures for the consumer-oriented transactions at issue in this case at all of its establishments nationwide (including without limitation the Casino at Dania Beach) – including by, without limitation, negotiating, entering into, and acting pursuant to various contracts and agreements with the electronic payment processing company whose technology Defendant uses to process all such transactions at its establishments nationwide (including without limitation at the Casino at Dania Beach).

48.     The point of sale systems of Defendant, and/or of its agent or agent(s), including without limitation the electronic payment processing company retained by Defendant, maintain records of all payment transactions and store customers' information, including duplicate hard copies and electronic copies of all payment receipts provided to customers.

49.     Notwithstanding its extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendant issued millions upon millions of point of sale receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers.

50.     By shirking the requirements of this important federal statute on such a massive and likely unprecedented scale, in an environment already ripe for identity theft and other evils,

Defendant uniformly invaded Plaintiff's and the other putative Class members' privacy. Defendant's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, including identity thieves who thrive in environments such as Defendant's establishment, as well as the Defendant's employees who handled the receipts.

51.     Simply put, by printing millions of transaction receipts in wholesale violation of this duly-enacted, long-standing, and well-known federal statute, Defendant has caused – to paraphrase the words of the Honorable Judge Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendant. *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

52.     In view of the substantial harm and other risks to Plaintiff and the Class caused by Defendant's willfully unlawful conduct, and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendant from continuing to print receipts at its point of sale terminals in violation of FACTA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007 (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law).

## CLASS REPRESENTATION ALLEGATIONS

48.     This action is also brought as a Class Action under Fed. R. Civ. P. 23. Plaintiff proposes the following class, defined as follows, subject to modification by the Court as required:

> *All persons in the United States who, within the two (2) years prior to the filing of the complaint through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a consumer-issued (viz., not business-issued) debit card or credit card at one or more of Defendant's*

> *establishments located on non-tribal owned land in the United*
> *States, and (ii) were provided a printed receipt displaying more*
> *than the last 5 digits of the credit or debit card number used in*
> *connection with such transaction(s).*

53.     Plaintiff also proposes the following subclass, subject to modification by the Court

as required:

> *All persons in the United States who, within the two (2) years prior*
> *to the filing of the complaint through the date of the Court's order*
> *granting class certification, (i) engaged in one or more transactions*
> *using a consumer/individual-issued (viz. not business issued) debit*
> *card or credit card at one or more of Defendant's establishments*
> *located non-tribal owned land in the United States, and (ii) for*
> *which Defendant's point-of-sale system was programmed to*
> *generate a printed customer receipt displaying more than the last 5*
> *digits of the credit or debit card number used in connection with*
> *such transaction(s).*

49.     Plaintiff falls within the class definition and is a member of the class. Excluded

from the class is Defendant and any entities in which Defendant has a controlling interest,

Defendant's agents and employees, Plaintiff's attorneys and their employees, the Judge to whom

this action is assigned and any member of the Judge's staff and immediate family, and claims for

personal injury, wrongful death, and/or emotional distress.

**A.     CERTIFICATION UNDER EITHER RULE 23(b)(2) OR (b)(3) IS PROPER.**

50.     The members of the class are capable of being described without managerial or

administrative problems. The members of the class are readily ascertainable from the information

and records in the possession, custody or control of Defendant.

51.     Defendant prints receipts reflective of credit card and/or debit card transactions to

numerous patrons per day, 365 days per year. Therefore, based upon Defendant's annual flow of

guests and net income, *supra*, it is reasonable to conclude that the class is sufficiently numerous

such that individual joinder of all members is impractical. The disposition of the claims in a class

action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendant's records or Defendant's agents' records.

54.    All or most purchases at Defendant's establishment for which a FACTA-violative receipt is provided are paid with a consumer card, rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendant and its merchant bank(s) could easily identify whether a particular transaction involved a business card or a consumer card.

52.    Further, the first six (6) digits of a credit or debit card would readily determine whether the corresponding card is a business or consumer card. That is because the first six (6) digits of a credit or debit card number constitute what is known as the Bank Identification Number ("BIN") that represents several items of information, including whether it is a consumer card or commercial (business) card. Finally, Visa, MasterCard, American Express and Discover only allow specific BINs and BIN ranges to identify consumer cards, and specific BINs and BIN ranges identify commercial (business) cards. Consumer cards and business cards do not share the same BINs or BIN ranges.

53.    There are common questions of law and fact that predominate over any questions affecting only the individual members of the class. The wrongs alleged against Defendant are statutory in nature and common to each and every member of the putative class.

54.     While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf of the class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

55.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the class predominate over questions that may affect individual Class Members, including the following:

a.     Whether, within the two (2) years prior to the filing of this Complaint, Defendant and/or its agents completed transactions by credit or debit card from any consumer and subsequently gave that consumer a printed receipt upon which more than the last five (5) digits of the card number was displayed;

b.     Whether Defendant's conduct was knowing or reckless;

c.     Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

d.     Whether Defendant should be enjoined from engaging in such conduct in the future.

55.     As a person that patronized Defendant's establishment and received a printed receipt containing more than the last five (5) digits of his credit card, Plaintiff is asserting claims that are typical of the proposed class. Plaintiff will fairly and adequately represent and protect the interests of the class in that Plaintiff has no interests antagonistic to any member of the class.

56.     The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing Class Members with electronically printed receipts in violation of the Receipt

Provision. The secondary question is whether Defendant willfully, knowingly, or recklessly provided such electronically printed receipts, despite knowledge of the unlawful nature of such policy.

56.     Plaintiff and the members of the class have all suffered harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Defendant's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendant will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

57.     Defendant's defenses are and will be typical of Plaintiff's and the same or identical for each of the members of the class and will be based on the same legal and factual theories. There are no unique defenses to any of the Class Members' claims.

58.     A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with federal law. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

59.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

### COUNT I – VIOLATIONS OF 15 U.S.C. § 1681(c)(g)

60.     15 U.S.C. §1681c(g) states as follows:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

61.     This section applies to any "device that electronically prints receipts" (hereafter "Devices") at point of sale or transaction. 15 U.S.C. §1681c(g)(3).

62.     Defendant employs the use of said Devices for transactions at its Casino at Dania Beach establishment in Dania Beach, Florida.

63.     On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Defendant that failed to comply with the Receipt Provision.

64.     At all times relevant to this action, Defendant was aware, or should have been aware, of both the Receipt Provision as well as the need to comply with said provision.

65.     Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, nor the subsequent years since FACTA became effective; and having knowledge of the Receipt Provision and FACTA as a whole; Defendant knowingly, willfully, intentionally, and/or recklessly violated and continues to violate the FCRA and the Receipt Provision.

67.     By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Defendant caused Plaintiff to suffer a heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposed Plaintiff's private information to those of Defendant's employees who handled the receipt and forced Plaintiff to take action prevent further disclosure of the private information displayed on the receipt. *See Muransky*, 2018 WL 4762434, at *6.

68.     As a result of Defendant's knowing or reckless violations of the FCRA, Plaintiff and members of the class continue to be exposed to an elevated risk of identity theft. Defendant is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

*     *     *

**WHEREFORE**, Plaintiff Oneeb Rehman respectfully requests that this Court enter judgment in his favor and the class, and against Defendant Dania Entertainment Center LLC, d/b/a The Casino at Dania Beach, as follows:

a.     Granting certification of the Class;

b.     Awarding statutory damages;

c.     Awarding punitive damages;

d.     Awarding injunctive relief;

e.     Awarding attorneys' fees, litigation expenses and costs of suit; and

f.     Awarding such other and further relief as the Court deems proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 16, 2018.

Respectfully submitted,

_s/ Scott D. Owens_

Scott D. Owens, Esq.
Scott D. Owens, P.A.
Fla. Bar No. 597651
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Ph. 954.589.0588
Fax 954.337.0666
scott@scottdowens.com