## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-62481-CIV-ALTMAN/Hunt

| | |
|---|---|
| ONEEB REHMAN, individually and on behalf of all others similarly situated, | CLASS ACTION |
| Plaintiff, | (JURY TRIAL DEMANDED) |
| v. | |
| EVERI HOLDINGS, INC.; and EVERI PAYMENTS, INC., formerly known as GLOBAL CASH ACCESS HOLDINGS, INC., | |
| Defendants. | |

_____/

### FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiff Oneeb Rehman, on behalf of himself and all others similarly situated, complains and alleges as follows based on personal knowledge as to himself, on the investigation of his counsel, and on information and belief as to all other matters, and demands trial by jury:

### INTRODUCTON

1.      During the two years preceding the commencement of this action, Defendants Everi Holdings, Inc. and Everi Payments, Inc., formerly known as Global Cash Access Holdings, Inc. (hereinafter collectively, "Defendant" or "Everi"), knowingly and willfully violated the Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (the "FCRA") on an unprecedented scale.  Defendant did so by uniformly printing and providing its customers with copies of transaction receipts that displayed more than the last-five digits of its customers' credit and debit card numbers, in connection with cash-access transactions performed

---

[1]      Plaintiff files this First Amended Class Action Complaint with the written consent of Dania Entertainment Center, LLC, the sole defendant in the action prior to the filing of the instant First Amended Class Action Complaint. *See* Fed. R. Civ. P. 15(a)(2).

with Defendant at its points of sale located in hundreds of casinos and other gaming establishments throughout the country.

2.      In enacting FACTA – an important consumer protection statute aimed at preserving consumers' financial privacy and thus helping curb identity theft and other financial evils – Congress required all merchants nationwide, including the Defendant, to truncate all but the last five digits of consumers' credit and debit card numbers, as well as the expiration dates pertaining to such cards, from all printed transaction receipts provided to consumers at points of sale.

3.      Despite the clear language of the statute, and its straightforward and easy-to-comply-with mandate, Defendant intentionally, knowingly, and willfully failed to comply with FACTA by printing eight (8) digits of its customers' credit card and debit card numbers on all of the transaction receipts it provided to them during the applicable two-year statutory period.

4.      Thus, over that two-year period of time, Plaintiff and all other consumers who transacted with Defendant using a credit or debit card suffered a number of concrete and particularized harms, both tangible and intangible, including but not limited to violation of their substantive statutory rights conferred by 15 U.S.C. § 1681c(g), breach of their confidence in the safe handling of their account information, invasion of their privacy as a result of the disclosure of their account information, exposure to an elevated risk of identity theft as determined by Congress, the burden of having to keep or destroy the receipt to prevent further disclosure of their account information, and monetary harm resulting from the hefty transaction fee that Defendant charged and all of its customers were forced to pay in order to process the cash-access transactions in question in a supposedly secure and legally compliant manner (which ended up being anything but). Accordingly, Plaintiff and the unnamed members of the Class defined

below are entitled to an award of statutory damages and other relief as further detailed herein.

## JURISDICTION AND VENUE

5.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

6.     Personal jurisdiction and venue are proper because Plaintiff resides, and at all times relevant herein resided, in Florida and within this district; because the cause of action alleged by Plaintiff, on behalf of himself and the class, arose in substantial part from the Defendant's conduct in Florida and within this district; because Defendant is registered and licensed to do business in Florida and within this district; and because Defendant conducts, and conducted at all relevant times alleged herein, substantial business in Florida and within this district.

## PARTIES

7.     Plaintiff Oneeb Rehman is a natural person who resides, and at all relevant times resided, in Palm Beach County, Florida.

8.     Defendants Everi Payments, Inc. and Everi Holdings, Inc. (hereinafter referred to collectively as "Defendant" or "Everi") are Delaware corporations that maintain a shared corporate headquarters in Las Vegas, Nevada.  Everi provides, among other things, cash-access services to gamblers at thousands of casino gaming and other wagering establishments across the country and throughout the world.  Everi is the principal merchant in each cash-access transaction performed by a consumer at one on the hundreds of gaming establishment nationwide where Everi's services are provided, and Everi's clients (the owners and operators of these underlying establishments) act as Everi's agent by helping consumers perform such cash-access transactions with Everi at points of sale in their establishments.

9.     Acting as the principal merchant, Everi provides – either directly or through its gaming establishment clients (with whom it contracts) acting as its agents – various cash-access services at thousands of points-of-sale located at its clients' gaming establishments across the country  – including by dispensing cash withdrawn from its proprietary automated teller machines leased to its clients ("ATMs") and by processing credit and debit card cash-advance transactions on electronic terminals (also owned by Everi and leased to its clients) located at points-of-sale ("POS") in its clients' gaming establishments.

## FACTUAL ALLEGATIONS

### A.     BACKGROUND OF FACTA

10.     Identity theft is a serious issue affecting both consumers and businesses. As of 2018, a Harris Poll revealed that nearly 60 million Americans have been affected by identity theft.[2] There were a record high 16.7 million victims of identity fraud in 2017 alone, and account takeovers (when a thief opens a credit card account or other financial account using a victim's name and other stolen information) tripled in 2017 from 2016, causing $5.1 billion in losses.[3]

11.     Congress enacted FACTA to prevent identity theft and related harm. See Pub. L. No. 108-159 (December 4, 2003) ("An Act . . . to prevent identity theft . . . and for other purposes.")

12.     "[I]dentity theft is a serious problem, and FACTA is a serious congressional effort to combat it...the less information the receipt contains the less likely is an identity thief who happens to come upon the receipt to be able to figure out the cardholder's full account information." *Redman v. Radioshack Corp.*, 768 F.3d 622, 626 (7th Cir. 2014).

---

[2]     Source:     https://www.lifelock.com/learn-identity-theft-resources-how-common-is-identity-theft.html

[3]     Source: https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

13.     Upon signing FACTA into law, President George W. Bush remarked that "[s]lips of paper that most people throw away should not hold the key to their savings and financial secrets." 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). President Bush added that the government, through FACTA, was "act[ing] to protect individual privacy." *Id.*

14.     One such FACTA provision was specifically designed to thwart identity thieves' ability to gain sensitive information regarding a consumer's credit or bank account from a receipt provided to the consumer during a transaction, which, through any number of ways, could fall into the hands of someone other than the consumer.

15.     Codified at 15 U.S.C. § 1681c(g), this provision states the following:
Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

15 U.S.C. § 1681c(g) (the "Receipt Provision").

16.     After enactment, FACTA provided three (3) years in which to comply with its requirements, mandating full compliance with its provisions no later than December 4, 2006.

17.     The requirement was widely publicized among retailers and the FTC. For example, on March 6, 2003, in response to earlier state legislation enacting similar truncation requirements, then-CEO of Visa USA, Carl Pascarella, explained that, "Today, I am proud to announce an additional measure to combat identity theft and protect consumers. Our new receipt truncation policy will soon limit cardholder information on receipts to the last four digits of their accounts. The card's expiration date will be eliminated from receipts altogether. ... The first phase of this new policy goes into effect July 1, 2003 for all new terminals."[4] Within 24 hours, MasterCard and American Express announced they were imposing similar requirements.

---

[4]     Source: *Visa USA Announces Account Truncation Initiative to Protect Consumers from ID Theft*, PR NEWSWIRE (Mar 06, 2003).

18.     Card issuing organizations proceeded to require compliance with FACTA by contract, in advance of FACTA's mandatory compliance date. For example, the publication, "Rules for Visa Merchants," which is distributed to and binding upon all merchants that accept Visa cards, expressly requires that "only the last four digits of an account number should be printed on the customer's copy of the receipt" and "the expiration date should not appear at all."[5]

19.     Because a handful of large retailers did not comply with their contractual obligations with the card companies and the straightforward requirements of FACTA, Congress passed The Credit and Debit Card Receipt Clarification Act of 2007 in order to make temporary changes to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.[6]

20.     Importantly, the Clarification Act did not amend FACTA to allow publication of the expiration date or more than the last five digits of the card account number. Instead, it simply provided amnesty for certain past violators who disclosed card expiration dates, and only up to June 3, 2008. Expert proof continues to show the disclosure of excess card account number information or card expiration date information creates an increased risk of identity theft.

21.     Accordingly, card processing companies continued to alert their merchant clients, including Defendant, of FACTA's requirements. According to a Visa Best Practice Alert in 2010:

> Some countries already have laws mandating PAN truncation and the suppression of expiration dates on cardholder receipts. For example, the United States Fair and Accurate Credit Transactions Act (FACTA) of 2006 prohibits merchants from printing more than the last five digits of the PAN or the card expiration date on any cardholder receipt. (Please visit

---

[5]     Source: *Rules for Visa Merchants* (Sept. 1, 2007).

[6]     Source: https://www.govtrack.us/congress/bills/110/hr4008/text, *.R. 4008 (110th): Credit and Debit Card Receipt Clarification Act of 2007* (May 20, 2008).

http://www.ftc.gov/os/statutes/fcrajump.shtm for more information on the FACTA.) To reinforce its commitment to protecting consumers, merchants, and the overall payment system, Visa is pursuing a global security objective that will enable merchants to eliminate the storage of full PAN and expiration date information from their payment systems when not needed for specific business reasons. To ensure consistency in PAN truncation methods, Visa has developed a list of best practices to be used until any new global rules go into effect.

22.     As noted above, the processing companies have required that credit card or debit card expiration dates not be shown since 2003 and still require it. For example, American Express requires:

Pursuant to Applicable Law, truncate the Card Number and do not print the Card's Expiration Date on the copies of Charge Records delivered to Card Members. Truncated Card Number digits must be masked with replacement characters such as "x," "*," or "#," and not blank spaces or numbers.

23.     Similarly, MasterCard required in a section titled Primary Account Number (PAN) truncation and Expiration Date Omission:

A Transaction receipt generated by an electronic POI Terminal, whether attended or unattended, must not include the Card expiration date. In addition, a Transaction receipt generated for a Cardholder by an electronic POI Terminal, whether attended or unattended, must reflect only the last four digits of the primary account number (PAN). All preceding digits of the PAN must be replaced with fill characters, such as "X," "*," or "#," that are neither blank spaces nor numeric characters.

24.     So problematic is the crime of identity theft in the United States that the three main credit reporting agencies, Experian, Equifax, and Transunion, joined to set-up a free website (http://www.annualcreditreport.com) in order to comply with FACTA requirements and to provide the citizens of this country with a means of monitoring their credit reports for possible identity theft.

25.     FACTA expressly prohibits printing of more than the last five (5) digits of the card account number on transaction receipts to protect persons from identity theft and other evils.

B. THE ESTABLISHMENTS OF DEFENDANT'S CASINO-CLIENTS ARE BREEDING GROUNDS FOR IDENTITY THIEVES AND OTHER WHITE-COLLAR CRIMINALS

26. Consumer identity theft, which the Receipt Provision was designed to protect against, is especially rampant at gambling establishments like those served by Defendant.

*27.* It has been estimated that "40 percent of white-collar crime has its root in gambling."[7]

28. "[T]he ready availability of credit in and around casinos," including in  the establishments of Defendant's casino-clients, "can lead to irresponsible gambling and problem and pathological gambling behavior. Forty to sixty percent of the cash wagered by individuals in casinos is not physically brought onto the premises.  Each year casinos extend billions of dollars in loans to their customers in the form of credit markers. Additional sums are charged by casino customer on their credit cards as cash advances. Casinos charge fees for cash advances ranging from 3 percent to 10 percent or more."[8]

29. "Not surprisingly, . . . many problem and pathological gamblers steal or commit other crimes to finance their habit.   According to the National Research Council, 'as access to money becomes more limited, gamblers often resort to crime in order to pay debts, appease bookies, maintain appearances, and garner more money to gamble.'"[9] In fact, the correlation between casino gambling and crime is so strong that, "[d]uring the first three years of casino gambling [in] Atlantic City, [the city] went from 50th in the nation in per capita crime to first. Overall, from 1977 to 1990, the crime rate in that city rose by an incredible 230%."[10]

---

[7]      Source:     https://www.congress.gov/crec/1997/02/10/CREC-1997-02-10-pt1-PgH401.pdf,     The Congressional Record, Feb. 10, 1997.

[8]      Source:  https://govinfo.library.unt.edu/ngisc/reports/7.pdf,  Chapter 7: Gambling's Impact  on People and Places, *National Gambling Impact Study Commission Report* (June 18, 1999).

[9]      Source: *Id.* at 7-13.

[10]      Source:    https://www.fdle.state.fl.us/cms/FCJEI/Programs1/SLP/Documents/Full-Text/Yates.aspx, *Casino Gambling: Is it A Good Bet for Florida's Future?*, Jerry J. Yates, at 11.

30. "Over the past two decades, there have been numerous suggestions in the academic literature and in political debate that gambling is associated with <u>white-collar crimes, such as embezzlement, forgery and fraud</u>."[11] (emphasis added). For instance, "[i]n a survey of nearly 400 Gamblers Anonymous members, 57 percent admitted stealing to finance their gambling. Collectively they stole $30 million, for an average of $135,000 per individual. One witness before the Commission indicated that '80 to 90 percent of people in Gamblers Anonymous will tell you they did something illegal in order to get money to gamble.' <u>A lot of them do white collar crimes, fraud, credit card and employee theft</u>."[12] (emphasis added).

31. Indeed, casinos throughout the United States have been bastions of identity theft, credit card fraud and other white-collar crime for nearly three decades. For example, since as far back as 1992, there have been numerous instances in which "tens of thousands of dollars" have been stolen by individuals using forged or stolen credit cards in casinos -- including, by way of illustration, through the following scam employed at the "Foxwoods" casino in Connecticut:

> The men fed forged or stolen credit cards into machines at the casino that are designed to check credit limits and authorize cash advances instantly. If the advance is approved, the machine notifies a teller in the casino cashier's booth and spits out a receipt for the borrower. The borrower takes the receipt to the teller and is issued cash after showing the credit card and other identification.[13]

32. More recently, in November 2010 and February 2011, five people were arrested in Rancho Mirage, California and two in Santa Barbara, California for using fake

---

[11]     Source:  http://www.leg.state.fl.us/GamingStudy/docs/FGIS_Spectrum_28Oct2013.pdf,  *Gambling Impact Study: Part 1, Section A: Assessment of the Florida Gaming Industry and its Economic Effects,* Spectrum Gaming Group (Oct. 28, 2013).

[12]     Source: *Chapter 7: Gambling's Impact on People and Places,* Final Report of the National Gambling Impact Study Commission, Government Publishing Office, at 7-13.

[13]     Source: *Gaming Industry Encounters Misfortune, Fortune*, The Courant (May 16, 1992), http://articles.courant.com/19920516/news/0000201897_1_creditcardscamcasinocashiercasinosopening (last accessed Apr. 23, 2019).

credit cards at casinos, manufactured using stolen personal information.[14]  In March 2012, a Connecticut man was arrested for "leading a criminal organization using counterfeit Discover cards at Mohegan Sun and Foxwoods casinos to obtain cash advances at least twice a week over three months[.]"[15]  In 2014, "[a] New York man pleaded guilty . . . to conspiracy to use counterfeit cards to draw cash advances in Louisiana casinos,"[16] and ten people were arrested in New Orleans, Louisiana "on racketeering charges in an identity theft and counterfeit credit card scheme involving a group of New Yorkers who received tens of thousands of dollars in allegedly fraudulent cash advances from Harrah's New Orleans Casino."[17]  And in January 2016, "[a] man suspected of making fake credit cards was arrested at a hotel at Foxwoods casino[.]"[18]

33.    The Federal Trade Commission Red Flags Rule requires businesses and organizations such Defendant's casino clients to implement a written Identity Theft Prevention Program designed to detect the warning signs – or red flags – of identity theft in their day-to-day operations.

34.    Casinos like those of Defendant's clients are subject to an array of federal laws and regulations, including the Bank Secrecy Act and the 2003 FACTA amendments

---

[14]    Source: *2 Arrested, Accused of Casino Credit Card Fraud,* The Orange County Register (Nov. 28, 2010), http://www.ocregister.com/articles/casino-277896-cards-credit.html (last accessed Mar. 12, 2017); *Deputies Nab Five for Credit Card Fraud*, Santa Barbara Independent (Feb. 18, 2011), http://www.independent.com/news/2011/feb/18/deputiesnabfivecreditcardfraud/ (last accessed Apr. 23, 2019).

[15]    Source: *Police Break Up Casino Credit Card Scam*, NBC Connecticut (Mar. 16, 2012), http://www.nbcconnecticut.com/news/local/PoliceBreakUpCasioCreditCardScam142965455.html (last accessed Apr. 23, 2019).

[16]    Source: Guilty plea entered in casino scam case, The Acadiana Advocate (May 19, 2014), http://www.theadvocate.com/acadiana/news/article_3ee22c93-0eb7-5d46-a571-2f624954b84f.html (last accessed Apr. 23, 2019); *10 charged in cash-advance fraud scheme at Harrah's Casino*, The Acadiana Advocate (July 31, 2014), http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Apr. 23, 2019).

[17]    Source: *10 charged in cash-advance fraud scheme at Harrah's Casino,* (July 31, 2014) http://www.theadvocate.com/new_orleans/news/article_bba2fa01-e821-563b-b9b7-43f7bb8129ea.html (last accessed Apr. 23, 2019).

[18]    Source: *Police Make Credit Card Fraud Arrests at Foxwoods Hotel*, NBC Connecticut (Jan. 19, 2016), http://www.nbcconnecticut.com/news/local/PoliceMakeCreditCardFraudArrestsatFoxwoodsHotel365746371.html (last accessed Apr. 23, 2019).

to FCRA, under which federal agencies such as the Federal Trade Commission ("FTC") and Securities and Exchange Commission ("SEC") have promulgated anti-money-laundering and identity-theft Red Flag Rules.  Among other requirements, these Red Flag Rules require "creditors," which includes casinos like those served by Defendant, to:  1) develop and implement a written identity theft protection programs designed to detect, prevent and mitigate identity theft; and 2) periodically perform risk assessments to determine whether the casino's practices pose any "reasonably foreseeable risk" of identity theft to its patrons.  Failure to comply with the Red Flags Rules could risk regulatory penalties, loss of licensure, and civil liability.

35.    In developing, implementing, and refining its Red Flag Rule identity-theft compliance program, Defendant and their casino-clients would certainly have considered and addressed, among other things, the need for strict compliance with FACTA's receipt truncation provisions.  This would include training cage personnel and other employees to prioritize and keep in confidence patrons' credit card numbers and other sensitive financial information, a review of best practices for identity theft prevention in consumer financial transactions, including a review of current best practices for compliance with FACTA's receipt truncation requirements, and an ongoing periodic review and refinement of cage processes and procedures in light of current guidance from their own payment processors and other relevant vendors, as well as from major payment processors, such as VISA and Mastercard.

36.    As part of its ongoing duty to consistently update its identity-theft prevention program, Defendant and their casino-clients would periodically hire third-party service providers to audit and propose improvements to its compliance program and to train cage and other personnel in best practices for identity-theft prevention.  These training programs routinely emphasize the critical importance of strict compliance with FACTA, and the severe identity-theft risks posed by casinos'

failure to comply.  Through these and other training programs, Defendant would have repeatedly been presented with and considered the requirements of and need for FACTA compliance, including FACTA's receipt truncation requirements.

C.   DEFENDANT'S PRIOR KNOWLEDGE OF FACTA

37.   Defendant had actual knowledge of FACTA's truncation requirement before it began failing to comply with the requirement *en masse*.

38.   Everi provides credit and debit card cash-access services to its clients' patrons at points of sale located in all of its clients' gaming establishments.

39.   Everi provides these services to each of its clients' patrons, including the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida during the time period relevant to this action, pursuant to a contractual relationship that Everi maintains with all of its clients across the country, pursuant to a standardized services agreement written by Everi at its complete and sole discretion, the material terms of which do not vary in a way material way for purposes of this litigation. On information and belief, the standardized services agreement entered into between Everi and each of its clients, including the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida during the time period relevant to this action, specifically provides that Everi acts as the principal merchant and each of Everi's clients acts as Everi's agent in performing and processing all of the credit and debit card cash-access purchases performed by patrons of Everi's clients at points-of-sale located in all of the gaming establishments owned or operated by Everi's clients, including the Casino at Dania Beach in Dania Beach, Florida at all times relevant to this action.

40.   The underlying technology used by Everi to perform such transactions (including all equipment and software) – by way of each of its clients acting as its agent, including the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida during the time period relevant to this action – is proprietary to Everi; owned by Everi

(and leased to its clients); operated, maintained, and controlled by Everi; and overseen remotely on a cloud-based system by Everi.  All of the guidelines, procedures, and requirements for processing cash-access transactions via such technology are developed, controlled, and strictly maintained, mandated, and uniformly imposed by Everi.  Everi develops and provides various training programs to the employees of each of Everi's clients with respect to the processing of cash-access transactions, including the printing and providing of receipts to customers. And the information printed on the automatically-printed customer-copy transaction receipts that Everi provides to patrons in connection with all such transactions is controlled entirely by Everi.

41.     Simply put: it is Everi, the principal merchant, acting through each of its gaming conglomerate clients as its agent, including the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida during the time period relevant to this action, who processes and performs all of the credit and debit card cash-access transactions conducted by its clients' patrons at points-of-sale at its clients' establishments nationwide, and it is therefore Everi who prints and provids paper transaction receipts to all of the patrons with whom it has transacts.

42.     Everi's clients and their employees, who thereafter act as Everi's agents in processing the cash-access transactions in question, have been well trained by Everi regarding the requirements imposed by FACTA and its truncation provision. For instance, current employees at the Casino at Dania Beach in Dania Beach, Florida tout knowledge of these requirements.  For example, Karen Lopez, currently an Acting Director at the Casino at Dania Beach, claims to have conducted "internal investigations and department trainings" specifically for the purpose of "protect[ing] the assets and every individual on property" and "provide maximum deterrence, detection and

immediate response to: theft, cheat/scams on property, harm to our employees and guests . . .," such as identity theft.[19]

43.     There are numerous state and federal statutes and operating regulations governing the gambling, pari-mutuel wagering, slot machines and card rooms where Everi's cash-access services are provided – all of which Defendant and its agents and employees, including its casino clients, are well versed in – that require Defendant directly and indirectly through its agents to maintain full compliance with state and federal regulations such as FACTA.

44.     Most of Defendant's business peers and competitors currently and diligently ensure their credit card and debit card receipt printing process remains in compliance with FACTA by consistently verifying their card machines and devices comply with the Receipt Provision. Defendant could have readily done the same.

45.     Defendant's self-professed knowledge and experience regarding federal laws governing financial transactions no doubt translates to Defendant having intimate knowledge of the requirements of FACTA, a federal law governing financial transactions.

46.     Not only was Defendant informed not to print more than the last five digits of credit cards or debit cards on transaction receipts, it was contractually prohibited from doing so. Defendant accepts credit cards and debit cards from all major issuers, such as Visa, MasterCard, American Express and Discover Card.  Each of these companies sets forth requirements that merchants, including Defendant, must follow, including the Receipt Provision.

47.     Defendant, and thus each of its casino clients, each of whom acted and acts as Everi's agent in the course of performing the transactions in questions in this litigation, had actual knowledge, at all relevant times, of FACTA's truncation provision and of Defendant's failure to comply with the requirements of FACTA's truncation provision at

---

[19]     *See* https://www.linkedin.com/in/karen-lopez-27736a119/.

all of its clients' establishments nationwide.  Despite having such knowledge, Everi chose to systematically violate FACTA anyway.

48.     Cynically, Defendant intentionally violated FACTA to protect itself against liability for consumer-initiated chargebacks, resulting from individuals' fraudulent or otherwise unauthorized use of credit and debit cards to access cash via the POS services Everi provides.

49.     As discussed above, the casino gaming industry is one of the main targets for identity theft.  As such, companies operating in the sector should apply extra care in preserving customers' data and preventing identity theft. Given the size and years of experience of Defendant's business, and the various state and federal regulations governing its business, not to mention the prevalence of financial crimes in and around its casino clients' establishments, such as the Casino at Dania Beach, at minimum Defendant acted in reckless disregard of FACTA's requirements and purpose when it allowed its system to print eight (8) digits of its customers' credit cards and debit cards on transaction receipts, together with other pieces of information about its customers, including their initialed signatures.

50.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has a written policy in place requiring compliance with all federal regulations governing its financial activities; this is evidenced by the fact that Defendant used to, subsequent to the enactment of FACTA and prior to the violative conduct alleged herein, truncate credit card and debit card account numbers in compliance with FACTA.

51.     Upon information and belief, it would take an individual less than one minute to run a test receipt to determine whether Defendant's system was in compliance with federal law(s) or Defendant's own alleged written policy requiring the truncation of credit card and debit card numbers.

52.     Additionally, for over 16 months Defendant has had actual knowledge of other FACTA litigation initiated and threatened to be initiated in courts throughout the country against its gaming company clients. Each such case alleged claims that arose from receipts printed and provided by Defendant in connection with cash access transactions at one of its' clients' establishments, processed via the same uniformly-maintained debit and credit card transaction technology all of Defendant's clients utilize, including the Casino at Dania Beach in Dania Beach, Florida during the relevant time period.  Remarkably, Defendant's printing of transaction receipts in violation of FACTA's truncation requirement continued unabated for much if not all of that 16-month period of time, in disregard of the law and its patrons' financial privacy and security.

### D.  PLAINTIFF'S FACTUAL ALLEGATIONS

53.     On or about December 5, 2017, Plaintiff used his personal credit card to perform a cash-access transaction with Defendant (the principal merchant acting through its agent or agent(s)) at a point-of-sale terminal, using Defendant's CashClub technology, located at the Casino at Dania Beach in Dania Beach, Florida.

54.     In order to complete the transaction, Plaintiff was forced to pay a transaction fee to Defendant, through its agent or agent(s), in the amount of $6.99, in addition to principal amount of the transaction. Plaintiff is informed and believes, and thereupon alleges, that Defendant sets the amount of the transaction fee that all transacting patrons (including Plaintiff) must pay in connection with performing a cash-access transaction at all of the establishments owned or operated by Defendant's clients (including without limitation the Casino at Dania Beach), that Defendant (acting as the principal merchant through its agent or agent(s)) collected the transaction fees paid by Plaintiff and every other transacting patron at such establishments during the relevant time period, and that Defendant retained all or a substantial portion of the transaction

fees that Plaintiff and all other transacting patrons paid to Defendant at such establishments during the relevant time period.

55.     Plaintiff used his personal credit card to pay Defendant (the principal merchant with whom he transacted, via its agent or agent(s) acting as an intermediary or intermediaries) for the cash-access point-of-sale purchase he performed with Defendant at the Casino at Dania Beach in Dania Beach, Florida on or about December 5, 2017. In connection with such credit card purchase, at the same time as Plaintiff received the cash he had purchased, Defendant (acting as the principal merchant through its agent or agent(s)) presented Plaintiff with an electronically-printed receipt bearing the first four (4) and last four (4) digits of his credit card number.  A true and correct copy (with the first-four digits of his credit card number redacted) is attached hereto as Exhibit 1.

56.     In addition to bearing eight (8) digits of his credit card, the receipt printed by Defendant and provided to Plaintiff by Defendant identifies the complete first and last name and initialed signature of Plaintiff, the individual to whom the card is issued, as well as the card issuer (in this case VISA) and the transaction date and time.

57.     The printing of the receipt invaded Plaintiff's privacy as it disclosed his private card account information to the casino employee who handed him the receipt on Defendant's behalf and additionally was likely exposed, on information and belief, to other patrons and/or surveillance cameras recording high-definition video footage of the point-of-sale at which such receipt was provided to Plaintiff.

58.     The printing of the receipt breached Plaintiff's confidence in Defendant to properly handle his account information, and also constitutes a breach of implied bailment.

59.     The printing of the receipt additionally harmed Plaintiff because Defendant had imposed on and unjustly retained a substantial service fee from Plaintiff for the

privilege of making the credit card transaction at issue in this case in a supposedly secure manner, which is the exact opposite of the true nature of the way in which Defendant processed the transaction.

60.   As a direct result of receiving the receipt containing the first and last four digits of his card number, Plaintiff took action to safeguard the receipt.

E.   DEFENDANT'S MISDEEDS

61.   At all times relevant herein, Defendant was acting by and through its subsidiaries, agents, servants and/or employees, including without limitation the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida and its employees, each of whom acted within the course and scope of its agency or employment, under the direct supervision and control of Defendant, and, on information and belief, pursuant to the terms of a standardized contract between Defendant and the owner and/or operator of the Casino at Dania Beach in Dania Beach, Florida and/or another of its subsidiaries, agents, servants and/or employees with whom it contracted, the material terms of which remained (at all relevant times) the same or substantially the same as the relevant terms of the contractual relationships between Defendant and each of its other clients in the United States.

62.   At all times relevant herein, the conduct of the Defendant, as well as that of its subsidiaries, agents, servants and/or employees, was in willful, knowing, or reckless disregard for federal law and the rights of the Plaintiff and other members of the class.

63.   Plaintiff is informed and believes, and thereupon alleges, that Defendant implements, oversees, and maintains control over the same uniform debit and credit card payment processing technology, pursuant to the same uniformly-implemented policies, practices, and procedures for performing the cash-access consumer-oriented transactions at issue in this case at all of its casino-clients' establishments nationwide (including the Casino at Dania Beach in Dania Beach, Florida) – including by, without

limitation, negotiating, entering into, and acting pursuant to contracts and agreements with its casino clients that govern the use of Defendant's electronic payment processing technology at its clients' establishments, the terms of which uniformly provide that Defendant acts as the principal merchant and that each of Defendant's clients acts as Defendant's agent with respect to the cash-access transactions performed by patrons at the Everi-maintained points-of-sale at its establishments.

64.     Defendant uniformly prints receipts for patrons in connection with each cash-access transaction performed at all of its clients' establishments, including the Casino at Dania Beach in Dania Beach, Florida, and in connection with each such transaction uniformly mandates and requires, pursuant to the same uniform policies and procedures, that each of its clients, as its agents provide the printed receipt to the patron with whom Defendant performed the transaction at the point-of-sale transaction location – i.e., immediately upon receipt of credit card or debit card payment.

65.     The systems of Defendant, and/or of its agent or agent(s), maintain records of all credit and debit card transactions and store all transacting patrons' identifying and contact information, including copies of patrons' drivers' licenses and duplicate hard copies and electronic copies of all payment receipts provided to customers.

66.     Notwithstanding the fact that it has extensive knowledge of the requirements of FACTA and the dangers imposed upon consumers through its failure to comply, Defendant issued tens of millions of transaction receipts containing the first four (4) and last four (4) digits of credit and debit card account numbers, violating FACTA on an unprecedented scale during the relevant time period.

67.     By shirking the requirements of this important federal statute on such a large scale, in an environment already ripe for identity theft and other evils, Defendant uniformly invaded Plaintiff's and the other putative Class members' privacy, breached their confidence, mishandled their personal account information, and exposed them to

an elevated risk of identity theft.  Defendant's conduct alleged herein resulted in the disclosure of Plaintiff's and the Class members' private financial information to the world, including to persons who might find the receipts in the trash or elsewhere, such as identity thieves who thrive in environments such as Defendant's establishment, and those of the Defendant's and its casino-clients' employees who handled the receipts.

68.     Simply put, by printing numerous transaction receipts in violation of this long-standing and well-known federal statute, Defendant has caused – to paraphrase the words of the Honorable Judge Richard A. Posner (retired) – "an unjustifiably high risk of harm that [wa]s either known or so obvious that it should [have been] known" to Defendant.  *Redman v. RadioShack Corp.*, 768 F.3d 622, 627 (7th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

69.     Moreover, Defendant also harmed Plaintiff and other consumers by imposing and unjustly retaining substantial service fees from Plaintiff and the Class members for the privilege of making the debit and credit card transactions at issue in this case in a supposedly secure manner.  Indeed, a substantial portion of the service fees that Defendant charged to Plaintiff and the other members of the Class to facilitate their debit and credit card transactions was supposedly attributable to the various procedural safeguards and compliance monitoring measures that Defendant and its casino-clients had implemented to ensure the safe, secure, and legally compliant processing of consumer transactions.  And in fact, Plaintiff and the other Class members paid these service fees to Defendant with the expectation that their transactions would be processed and their data secured in compliance with all applicable federal laws, including the truncation requirement of FACTA.

70.     In other words, what Plaintiff and the other members of the Class received (insecure transactions recorded on receipts printed and provided to them in violation of federal law) was less valuable than what they paid for (transactions securely processed

and recorded on written receipts in compliance with federal data-privacy laws and regulations).  Had Plaintiff and the other members of the Class known that Defendant would process their transactions and safeguard their transaction data insecurely, including by printing and providing to them receipts in violation of FACTA's truncation requirement, they would not have paid as much of a fee, if any fee at all, for the privilege of making the debit and credit card purchases at issue in this case.

71.    In view of the substantial harm and other risks to Plaintiff and the Class caused by Defendant's willfully unlawful conduct, *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007) (defendant is liable for willfully violating FACTA where violation was committed with "reckless disregard" for the law), and the likelihood that such harms and risks will continue absent judicial relief, the Court should enjoin Defendant from continuing to print receipts at its casino terminals in violation of FACTA.

## CLASS REPRESENTATION ALLEGATIONS

72.    This action is also brought as a class action under Federal Rule of Civil Procedure 23. Plaintiff proposes the following class, defined as follows, subject to amendment by Plaintiff as necessary or modification by the Court as required:

> All persons in the United States who, within the two (2) years prior to the filing of the original complaint in this action through the date of the Court's order granting class certification, (i) engaged in one or more transactions using a debit card or credit card at a point-of-sale located on non-tribal-owned land in the United States, (ii) where such transaction was processed via Defendant's CashClub technology; and (iii) for which Defendant's system was programmed to generate a printed customer receipt displaying more than the last 5 digits of the credit or debit card number used in connection with such transaction(s).

73.    Plaintiff falls within the class definition and is a member of the class. Excluded from the class is Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, Plaintiff's attorneys and their employees, the Judge to whom this action is assigned and any member of the Judge's

staff and immediate family, and claims for personal injury, wrongful death, and/or emotional distress.

74.     The members of the class are capable of being described without any significant managerial or administrative problem. The members of the class are readily ascertainable from the information and records in the possession, custody or control of Defendant.

75.     Defendant provides printed receipts to credit card and/or debit card transaction customers at hundreds of its casino-clients' establishments numerous times per day, 365 days per year. Therefore, it is reasonable to conclude that the class is sufficiently numerous such that individual joinder of all members is impractical. The disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. The Class can be identified through Defendant's records or Defendant's agents' records and the records of the banks that issued the credit/debit cards.

76.     Although FACTA does not distinguish between consumer and business transactions, on information and belief all or most transactions at Defendant's establishments for which a FACTA-violative receipt was provided were paid for using a consumer card rather than a business card. To the extent this is an issue, the payments made with the two types of cards are easily discernible: merchants are charged different interchange fees for card transactions that vary based on whether the card is a business card or a consumer card. There are different interchange categories and codes assigned to each transaction that distinguish whether a card used for a transaction is a business card or a consumer card. Defendant and its merchant bank could easily identify whether a particular transaction involved a business card or a consumer card.

77.     While all Class Members have experienced actual harm as previously explained herein, this suit seeks only statutory damages and injunctive relief on behalf

of the class and it expressly is not intended to request any recovery for personal injury and claims related thereto. Plaintiff reserves the right to expand the class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

78.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. The questions of law and fact to the class predominate over questions that may affect individual Class Members, including the following:

a.  Whether, within the two (2) years prior to the filing of the original complaint, Defendant, either directly or through an agent or agents, completed consumer transactions by credit or debit card and subsequently provided a printed receipt upon which more than the last five (5) digits of the card number was displayed;

b.  Whether Defendant's violations were knowing or reckless;

c.  Whether Defendant is liable for damages, and the extent of statutory damages for each such violation; and

d.  Whether Defendant should be enjoined from engaging in such conduct in the future.

79.     The principal question is whether Defendant violated section 1681c(g) of the FCRA by providing Class Members with electronically-printed receipts in violation of the Receipt Provision. The secondary question is whether Defendant knowingly or recklessly provided such electronically printed receipts.

80.     As a person who patronized one of Defendant's casino clients' establishments and received a printed receipt containing more than the last five (5) digits of his credit card, Plaintiff is asserting claims that are typical of the claims of the proposed class members. Defendant's defenses are and will be typical of Plaintiff's and

the same or identical for each of the members of the class and will be based on the same legal and factual theories. There are no unique defenses to any of the Class Members' claims.

81.     Plaintiff and his counsel will fairly and adequately protect the interests of the class. Plaintiff has no interests that conflict with the interests of the class and seeks the same relief as the class. Plaintiff is interested in pursuing his claims vigorously and has retained counsel competent and experienced in class and complex litigation, including under FACTA and other data privacy statutes.

82.     Plaintiff and the members of the class have all suffered harm as a result of the Defendant's unlawful and wrongful conduct. Absent a class action, the class, along with countless future patrons of Defendant's establishment, will continue to face the potential for irreparable harm. In addition, these violations of law would be allowed to proceed without remedy and Defendant will continue such illegal conduct. Because of the size of the individual Class Members' claims, few Class Members could afford to seek legal redress for the wrongs complained of herein.

83.     A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendant to comply with federal law. The interest of Class Members in individually controlling the prosecution of separate claims against Defendant is small. The maximum statutory damages in an individual action for a violation of this statute are minimal. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

84.     Defendant has acted on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## COUNT I – VIOLATIONS OF 15 U.S.C. § 1691(c)(g)

85.   Plaintiff incorporates the foregoing allegations as if fully alleged herein.

86.   15 U.S.C. §1681c(g) states as follows:

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

87.   This section applies to any "device that electronically prints receipts" (hereafter "Devices") at the transaction location. 15 U.S.C. §1681c(g)(3).

88.   During all or substantially all of the relevant time period, Defendant utlized, as the principal merchant acting through its clients as its agent or agent(s), said Devices to perform cash-access transactions with its clients' patrons on non-tribal owned land throughout the United States, including at the Casino at Dania Beach in Dania Beach, Florida and at numerous other establishments nationwide that were owned or operated by one of Defendant's clients.

89.   Defendant contracted with the owner or operator of the Casino at Dania Beach in Dania Beach, Florida and had contracted with each of its other clients who operated or owned such establishments on the same or materially the same terms, pursuant to which Everi provided each clients' patrons with cash-access transaction services that Defendant processed via the same CashClub technology, with Everi acting as the principal merchant and the respective client acting as its agent.

90.   On or before the date on which this complaint was filed, Plaintiff and members of the class were provided receipt(s) by Defendant that failed to comply with the Receipt Provision.

91.   At all times relevant to this action, Defendant was actually aware, or should have been actually aware, of both the Receipt Provision.

92.   Notwithstanding the three-year period to comply with FACTA and its accompanying provisions, and the subsequent years since FACTA became effective, and

despite having knowledge of the Receipt Provision and FACTA as a whole, Defendant knowingly, knowingly or recklessly violated and continues to violate the Receipt Provision.

93.     By printing more than the last five (5) digits of Plaintiff's credit card number on Plaintiff's transaction receipt, Defendant caused Plaintiff to suffer numerous harms as described above. This includes, but is not limited to: breach of confidence; heightened risk of identity theft, especially as the receipt displays the full name of the card holder on the it together with other sensitive information including the card holder's initialed signature; exposure of  Plaintiff's private information to those of Defendant's and its casino-clients' employees who handled the receipt; being forced to take action prevent further disclosure of the information displayed on the receipt; and monetary harm in the amount of the transaction fees that Plaintiff and the unnamed class members were forced to pay Defendant in exchange for a secure and legally compliant transaction (the exact opposite of what they received).

94.     As a result of Defendant's willful violations of the FCRA, Defendant is liable to Plaintiff and members of the class pursuant to 15 U.S.C. § 1681n for statutory damages, punitive damages, attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Oneeb Rehman respectfully requests that this Court enter judgment in favor of him and the class, and against Defendants Everi Holdings, Inc. and Everi Payments, Inc., as follows:

a.      Granting certification of the Class;

b.      Awarding statutory damages;

c.      Awarding punitive damages;

d.      Awarding injunctive relief;

e.      Awarding attorneys' fees, litigation expenses and costs of suit; and

f.     Awarding such other and further relief as the Court deems proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 29, 2019                    Respectfully submitted,

By: /s/ Scott D. Owens
        Scott D. Owens

SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

Frank S. Hedin
HEDIN HALL LLP
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Tel: 305-357-2107
Fax: 305-200-8801
fhedin@hedinhall.com

*Counsel for Plaintiff and the Proposed Class*